337 So.2d 165 (1976)
Michael Jon HERRIOTT
v.
STATE.
8 Div. 731.
Court of Criminal Appeals of Alabama.
March 9, 1976.
Rehearing Denied March 30, 1976.
*166 Johnston & Johnston, J. Allen Brinkley, Huntsville, for appellant.
William J. Baxley, Atty. Gen. and Ellis D. Hanan, Asst. Atty. Gen., for the State.
TYSON, Judge.
The three-count indictment charged the appellant with the second degree burglary and grand larceny of Arfor Byrnfield, Inc., doing business as "The Squash Blossom" in Huntsville, Alabama, and with buying, receiving, concealing, or aiding in concealing assorted jewelry, valued at $43,564.45, the personal property of Arfor Byrnfield, Inc. The jury's verdict found the appellant "guilty as charged," and the trial court then adjudged the appellant guilty and set sentence at four years imprisonment in the penitentiary, but suspended the sentence and placed appellant on probation for a period of four years..
Prior to the trial, the appellant had filed a motion to suppress the evidence, which was heard by the trial judge and denied. The same objection was raised at trial and overruled.
Detective J. W. King of the Huntsville Police Department testified that on the day after the break-in at the Squash Blossom, he received an anonymous[1] phone call which lead him and two other officers to the apartment of Bob Clancy, located at 2104 Quail Court, Huntsville, Alabama. Finding no one home, the officers decided to wait. At approximately 5:00 p. m., Bob Clancy pulled up on a motorcycle, followed by Cheryl Crawford, and the appellant in the latter's car. The officers approached them, identified themselves, and were "invited"[2] into the apartment. Once inside, and with everyone gathered in the kitchen area, Detective King explained that he and the other two officers were conducting an investigation for some missing jewelry that *167 had been stolen from the Squash Blossom the night before, and asked Clancy for permission to search his apartment.[3] Clancy unequivocally refused the officer's request and told them they would need a search warrant. It is true that Clancy subsequently capitulated and signed a consent to search form, but not until Detective King had made it clear that obtaining a search warrant would be a "mere formality," and that his, Clancy's, refusal would only serve to postpone the inevitable.
Contrary to Detective King's assertions, we note that the record offers not even the slightest evidence of probable cause, either for an arrest or a search. Clearly, the anonymous tip which lead the officers to Clancy's apartment was insufficient in this regard. Brown v. State, 42 Ala.App. 429, 167 So.2d 281. In fact, Detective King seemingly evidenced his knowledge of this fact when he, after receiving the tip, called the warrant magistrate and stated: "We possibly might need a consent to search warrant." [R. p. 29]
From Detective King's testimony [R. pp. 29-30]:
"Q. All right, will you please tell the Court what conversation you had with Mr. Clancy with regard to the consent to search?
"A. First of all I asked him would he sign the permission to search the apartment. At first, he didn't want to agree to it. He said I would need a search warrant.
"Q. Did you make any statements to him in regard to the search warrant?
"A. Yes, I told him I had already talked with a warrant magistrate and I could get a search warrant.
"Q. After you advised him of that, what took place?
"A. I read this form to him and I gave it to him to read himself, and he agreed to fill in the blanks and sign the form."
Further [R. pp. 32-33]:
"Q. So, when you walked in and said there's been some jewelry missing from the Squash Blossom and I want to search your apartment without a warrant, he would not let you do it at that point?
"A. At that point we asked him to let us search the apartment.
"Q. So the reason the consent was given, in this case, was because you told them you could go get a search warrant, didn't you?
"A. I told him I had contacted the Warrant Magistrate and he told me I could get a search warrant.
"Q. Didn't you tell him you would go get a search warrant and you were going to leave these two police officers there to stay until you got back?
"A. I told them I could go get a search warrant and they would stay outside until I got back.
"Q. And up to that time they would not consent to let you search the premises, would they?
"A. No."
"And again [R. pp. 34-35]:
"Q. Do you have a judgment whether or not you said you could probably get a search warrant or you said I'm going to go get a search warrant and leave my two friends here, standing guard or outside, or whatever?
"A. I believe I probably said I could get a search warrant.
"Q. But you told them you could get the warrant and you were not going to apply for it. Isn't that correct? Matter-of-fact, didn't you tell them you would be back in five minutes with a warrant?
"A. No, sir, I didn't tell them that.
"Q. You told them you would be back with a warrant, didn't you?
"A. I told them I would be back, yes.

*168 "Q. But you told them, and I'm not arguing with you, but you told them you could get the warrant, is that correct?
"A. Right.
"Q. You didn't tell them that you believed one may be issued, did you?
"A. No, sir, not that I recall.
"Q. And you didn't tell them that the decision rested with the Judge or Magistrate, did you?
"A. Not that I recall.
"Q. And you gave them two choices. (1) the search or (2) you would get the warrant, isn't that correct?
"A. I guess that's about the way it was."

I
Warrantless searches are per se unreasonable under the Fourth and Fourteenth Amendments subject to only a few "specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585.
Since the search of Bob Clancy's apartment was conducted without a search warrant, the State here attempts to justify the officers' action on the basis of alleged consent.
Mr. Justice Bloodworth, in Daniels v. State, 290 Ala. 316, 276 So.2d 441, enumerates the exceptions to the warrant requirement in the following language:
"Notwithstanding the United States Supreme Court's assertion that its cases on the subject of the extent of a search which may be made without a warrant following a lawful arrest `cannot be satisfactory reconciled,' it now seems to be fairly well established that there are at least six exceptions under which warrantless searches have been held valid, viz:
"(1) In `plain view,' see Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971);
"(2) With `consent' voluntarily, intelligently and knowingly given, see Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) and Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938);
"(3) As `incident to a lawful arrest,' see Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959);
"(4) In `hot pursuit' or `emergency' situations, see Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1947); State v. Sutton, (Mo.1970) 454 S.W.2d 481;
"(5) Where `exigent circumstances' exist coincidental with `probable cause' (as in the case of movables), see Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); and,
"(6) In `stop and frisk' situations, see Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)."
In discussing the question of whether or not consent was voluntarily given, the Supreme Court of the United States, in Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854, stated:
". . . Rather it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced. It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches."
In evaluating the circumstances surrounding the acquiescence to lawful authority, involved in a consent case, Judge Moylan of the Maryland Court of Special Appeals used the following language, in Whitman v. State, 25 Md.App. 428, 336 A.2d 515:
" . . . The lesson articulated by Bumper and Schneckloth in the area of search consents is that the individual subjected to the search may indeed be submitting rather than consenting, even in an atmosphere of relative cordiality because of the presence of psychological forces as potent and effectual in achieving *169 a `consent' as the traditional techniques and familiar instruments of physical `persuasion.' We must, we find, be guided by the holding in Bumper that a consent which is actually simple acquiescence to lawful authority is not voluntary and, when the defendant is in custody, by the concern expressed in Schneckloth that `in examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents.'
"While each case must rest for decision upon its own facts and the `totality of the circumstances,' an arrest without probable cause followed by custodial prodding for the arrestee's consent to a search, combined with police representations that the issuance of a warrant will be practically automaticthese are circumstances calculated only to persuade the individual that insistence upon Fourth Amendment guarantees will secure for him merely a delay of the inevitable search rather than the protection against unreasonable search and seizure to which he is constitutionally entitled. . . ."
Similarly, Mr. Justice Faulkner, speaking for our Supreme Court in Lietz v. State, 291 Ala. 133, 279 So.2d 116, stated:
"Unless we enforce the restrictions of the Fourth Amendment and Article 1, § 5 of the Alabama Constitution on searches and seizures, an old saying will have to be revised. A man's home will no longer be his `castle', but, his `open house' for everyone with a shred of governmental authority who wants to come inside. This cannot be permitted."
Mere submission to police authority will not suffice. Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797; Knox v. State, 42 Ala.App. 578, 172 So.2d 787, cert. den. 277 Ala. 699, 172 So.2d 795.
It is clear from the record that the officers in this case had no probable cause. Further, their entry into the apartment was by any standard questionable, though it be termed an "invitation" from Cheryl Crawford. Once inside the apartment, nothing occurred within the kitchen, nor was there any item within view inside the kitchen which gave the officers probable cause to arrest any of the parties, or to search the apartment in question. Carefully weighing all of these factors, we are of the opinion that the State here failed to establish the necessary voluntariness of the alleged consent. United States v. Boukater, 5 Cir., 409 F.2d 537.
It therefore follows that the appellant's motion to suppress, as filed in this cause, was due to be granted. The judgment is therefore reversed, and this cause is remanded.
REVERSED AND REMANDED.
CATES, P. J., and HARRIS and BOOKOUT, JJ., concur.
DeCARLO, J., dissents.
DeCARLO, Judge (dissenting).
The conviction in this case was reversed on the ground that the forty-two thousand dollars worth of stolen jewelry was seized through an unconstitutional search.
One of the reasons that I cannot agree with the court's reversal is because I believe the searching officer had valid permission to search.
Voluntary consent to search is an established exception to the warrant requirement of the Fourth Amendment. The test for consent is whether it was "voluntary" and "voluntariness" is a question of fact to be determined from all the circumstances. Schneckloth v. Bustamonte, supra.
This court in its majority opinion found that the consent given was the product of coercion implied from the statement that, if consent were not given, the officers would get a search warrant and would secure the premises while the warrant was being obtained. The court said the officers did not have probable cause to arrest or search *170 under the facts of the case since the State failed to establish the required voluntariness.
Voluntariness is a question of fact to be determined by the trial judge upon the totality of circumstances. No single criteria controls. Schneckloth v. Bustamonte, supra; Jones v. State, 49 Ala.App. 438, 272 So.2d 910.
I do not believe that the officer's statement that he would obtain a search warrant if consent were not given, necessitated a finding that the consent was per se involuntary. Certainly the securing of the premises would have been good police procedure and within the officer's legal authority. Anything less could have resulted in the disappearance of the contraband.
In the case at bar the appellant was not a resident but a guest. Cheryl Crawford shared the apartment with Robert Clancy, the lessee. He was the one who talked with Officer King and endorsed the consent to search form.
Appellant was present in the room when the "Miranda" warnings and the consent form were read to Clancy. He could have heard Clancy being apprised of the right to require a search warrant and to refuse the consent to search.
At no time did appellant object to the officer's overtures, but in fact, signed the form as a witness. The meaning of the admonitions should have been clear to all present. Had Clancy not meant that the officer was free to search, surely he would have protested. He had previously demonstrated that he knew of his right to require a search warrant when he had specifically asked whether the officer had a warrant.
At best, the suppression hearing culminated in a swearing match. The main evidence of Clancy's intention is the consent form. It contains the material circumstance that the consenter had been warned of the rights to be relinquished.
In Bumper, supra, the United States Supreme Court announced the test for a valid consent is a showing by the prosecution that the consent was "free and voluntary." Further, Bumper, supra, required that voluntariness be determined from the words used by the person consenting. Thus it seems essential that at the very least we should have the best account of what was said.
Neither Robert Clancy nor Cheryl Crawford testified at the suppression hearing or during the trial. With the exception of the testimony of the officer and appellant, the only evidence of what Clancy said was the consent form.
At no time during the encounter were the occupants in custody or were weapons drawn. It cannot be said that they were overwhelmed by authority in the dead of night; only four officers were involved in the confrontation at 5:30 on that evening.
It was after the jewelry was found that the occupants were arrested and taken to the police station. The appellant was asked to come to the station by Officer King. He was not arrested after the search, but approximately four hours later, when he gave a hand-written statement at the station. Herriott's arrest was not based upon the information received from the informant.
The claim of lawful authority referred to in Bumper, supra, did not exist here, nor was any assertion made that the police had come to search.
Officer King testified he informed Clancy of his rights from the "Miranda" card and the consent form. It was afterwards that he requested permission to search. (See Transcript pp. 33-35 in their entirety.) When Clancy inquired about a search warrant, King said he could get one and that he had talked with the magistrate earlier.
What the officer said could be interpreted to be a declaration of intent and not a matter-of-fact statement. Telephoning the magistrate could have been construed not as an indication that the obtaining of the search warrant would be a routine matter, but a determination of whether the magistrate would be available that Sunday afternoon.
*171 In the final analysis it was the trial judge who heard the witnesses and passed on their credibility. The testimony of the witnesses comes to us from a cold record. It can make an impression on us altogether different from what it could have made, had we heard and seen the witnesses. The trial judge is in a better position than we are to determine the circumstances surrounding the consent. Jones, supra. Although conflicting evidence was presented on the question of whether the consensual search was voluntary, it was after considering the evidence that the court decided it was.
I would not disturb that finding.
Respectfully, I dissent.
NOTES
[1] "Q. Later on that same afternoon, did you receive a tip in regard to this burglary?

"A. Yes, I did.
"Q. Was that from an informant?
"A. Yes.
"Q. Was it a confidential informant?
"A. MR. MORRIS: We object to that. It calls for a conclusion.
"Q. THE COURT: Overruled.
"A. I don't know who the name is, so I guess it was confidential." [R. pp. 62, 63]
[2] Detective King's testimony in this regard was as follows: "Well, I believe that Robert Clancy said to come up and the girl invited us in the apartment." [R. p. 8]
[3] At the pretrial hearing on appellant's motion to suppress, the trial court, before considering the consent issue, made a threshold determination that appellant did in fact enjoy standing to attack the reasonableness of the search and seizure. This ruling was clearly correct. See Ingram v. State, 45 Ala.App. 108, 226 So.2d 169.